## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 13-40035-JAR |
| JEROLD D. FISHER, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

The Government filed a Motion to Determine if Defendant Has Breached His Plea

Agreement (Doc. 37) to which Defendant objected.  After an evidentiary hearing, the Court took

the matter under advisement, and is now prepared to rule.  Defendant has failed to fully and

honestly identify and disclose the location and or disposition of assets and property derived from

the offense, only providing limited information of questionable credibility when pressed.  Thus,

the Court determines that Defendant has breached his plea agreement with the Government.

### I.    Background

On February 14, 2014, Defendant Jerold D. Fisher entered into a Plea Agreement with

the Government, in which he agreed to plead guilty to Count 2 of the Indictment.[1]  Count 2

charged Defendant with making false, fictitious and fraudulent claims on a Form 1040 and Form

W-2 for tax year 2009, showing federal withholding of $3,803,462 to obtain a tax refund of

$3,661,193, in violation of 18 U.S.C. § 287.

---

[1]Doc. 27.

In the Plea Agreement, Defendant agreed to imposition of an order of restitution in the

amount of $4,039,781.  Other material terms of the Plea Agreement include:

> c.  The defendant agrees to fully and completely assist the United States in the identification and recovery of forfeitable assets, either domestic or foreign, which have been acquired directly or indirectly through the unlawful activities of the defendant.
>
> d.  The defendant agrees to cooperate fully with the United States Attorneys Office and to provide a financial statement on a form approved by the USAO that discloses all assets in which defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party, as well as any transfer of assets that has taken place in the last 5 years.
>
> e.  The defendant agrees to submit to an examination, which may be taken under oath and may include a polygraph examination.
>
> . . . .
>
> g.  The defendant agrees to not encumber, transfer, or dispose of any monies, property or assets under defendant's custody or control, without written approval from the United States Attorneys Office.[2]

In turn, the Government promised to: not file any additional charges against Defendant,

or anyone acting in concert with Defendant, arising out of the facts forming the basis for the

Indictment; recommend a two-level, and under certain circumstances a three-level, reduction for

acceptance of responsibility; and recommend a sentence of 36 months.  The Plea Agreement

expressly makes the Government's obligations contingent on, "the defendant's continuing

manifestation of acceptance of responsibility as determined by the United States."[3]

The Plea Agreement provides that if

the defendant denies or gives conflicting statements as to his involvement, falsely

---

[2]Doc. 27 ¶ 1.c, d, e, g.

[3]Doc. 27 ¶ 5.

denies or frivolously contests relevant conduct that the court determines to be true, willfully obstructs or impedes the administration of justice as defined in U.S.S.G. §3C1.1 (or willfully attempts to do so), or engages in additional criminal conduct, the United States reserves the right to request a hearing to determine if the defendant has breached this agreement.

In the event the Court finds the defendant has breached this plea agreement or otherwise failed to adhere to its terms, the United States shall not be bound by this paragraph and may pursue any additional charges arising from the criminal activity under investigation as well as any perjury, false statement, or obstruction of justice charges which may have occurred.[4]

On May 27, 2014, this Court held a sentencing hearing, and entertained the parties' joint recommendation, pursuant to the Plea Agreement, that the Court sentence Defendant to 36 months' imprisonment. This Court expressed concern about that recommendation, albeit a recommendation that was not binding on the Court, given that the Sentencing Guideline range was 41 to 51 months' custody, and given that there was no explanation as to Defendant's disposition of much of the proceeds of the tax fraud. In response to the Court's comments, the Government explained that it had made "diligent efforts to try to locate assets,"[5] but had recovered only a "modest amount of property seized from Mr. Fisher,"[6] and had determined that he had purchased nearly $400,000 in gold coins that he subsequently had "been living on."[7] The Government further explained that while it had taken Defendant's deposition, and Defendant was "candid in respect to the questions that we knew to ask him about the assets,"[8] it had only

---

[4]*Id.*

[5]Doc. 30 at 7:22.

[6]*Id.* at 7:18–19.

[7]*Id.* at 7:24.

[8]*Id.* at 8:3–5.

"recovered a fraction of the \$4 million."[9]   At the time of the May 27, 2014 plea hearing, the

Government did not take the position that Defendant had breached the Plea Agreement.

This Court advised the parties that the sentencing hearing was being continued because

of the Court's concern about the disposition of the almost \$4 million in fraudulent tax refunds,

given that there was no evidence that it was dissipated though substance abuse or gambling, and

in fact there was no explanation with respect to much of the money.  The Court suggested that

Defendant "think about it some more and think about maybe there's some other information he

might be able to offer."[10]  The Court further stated that "I'm not willing, without any further

explanation, to honor the parties' agreement to sentence Mr. Fisher to under the guideline

range. . . . Not with this amount of loss."[11]

As the Marshals led Defendant out of the courtroom upon the adjournment of the May 27

sentencing hearing, Defendant exclaimed: "Three million was lost in the stock market.  They

know that."[12]  The Government denies that Defendant ever previously offered this explanation

for the dissipation of the proceeds of his tax fraud.  Consistent with their negotiated plea

agreement, the Government had deposed Defendant on May 6, three weeks before the May 27

sentencing hearing, yet Defendant never disclosed during that two-hour deposition that he had

lost three million dollars in the stock market.

But based on Defendant's excited declaration as he left the courtroom on May 27, the

---

[9]*Id.* at 8:6–7.

[10]*Id.* at 9:21–24.

[11]*Id.* at 10:1–5.

[12]*Id.* at 11:15–16.

Government endeavored to obtain records and other documentation from Defendant concerning his losses in the stock market.  At the same time, based on the Court's articulated concerns, Defendant produced records of his E-Trade and Community Bank accounts from which Defendant funded his stock market transactions.  Defendant also produced a rough, categorical accounting of his purported extensive cash expenditures.  The categories of his cash expenditures included: house, vehicle, living, doctor, business, travel and sports, bills paid, and miscellaneous.  There were purportedly sizeable expenditures in each category.  For example in just one of his three E-Trade accounts, Defendant's accounting was that he spent: $14,742.82 for "house expense," $62,616.50 for "living expense," $29,067.98 for "bills paid," $30,695.49 for "business expense," and $3,547.14 in "misc expense."  Yet Defendant provided little in further itemization or explanation of these expenditures; and he provided no documentation in support of these expenditures.

According to his itemization of cash expenditures, from 2008 to 2012, Defendant took various family members on more than nine family vacations, including enrolling his two sons in various professional players' sports camps.  From 2009–2012 Defendant took his wife Lynetta to twenty concert or sporting events.  From 2011–2013 he took his girlfriend Renita on thirty-nine vacations and/or concerts and sporting events.  And, from 2009–2010 he expended cash writing, editing and promoting his book, *Health A Lifestyle*, including wining, dining and vacationing with various "models" and "cheerleaders" who were helping him promote his book.  Many of these vacations, concerts and sporting events were out-of-state.  While Defendant offered that he could produce documentation of some of these travel expenditures, he has not produced any documentation—no airplane tickets, no hotel receipts, no records.

Defendant also retained a Certified Public Accountant to review his E-Trade and other bank accounts.  According to this CPA's accounting, Defendant spent $738,469.52 on the above-described categories of cash expenditures.  The CPA's accounting is based solely on the numbers provided by Defendant in the broad categories of expenditures outlined above.  In addition, Defendant had previously disclosed to the Government that he had purchased about $380,000 in gold, which the Government was able to verify.  And, the IRS seized $423,852.07 in cash and $567,496.26 (at cost) in property purchased with the tax fraud proceeds.  Thus, if credence is given to the categorical accounting provided by Defendant, his total cash expenditures were $2,109,817.85.   In addition, the E-Trade account records revealed that Defendant had lost $2.2 million in the stock market, and gained about $300,000, for a net loss of about $1.9 million in the stock market.  These two categories, cash expenditures and stock market losses, total about $4,000,000, the approximate amount that Defendant received in fraudulent tax refunds.

Between the May 27 and July 7 sentencing hearings, on June 30, Defendant filed a motion for release from custody pending sentencing, for health reasons; the Government filed an objection and also filed the instant motion to determine whether Defendant had breached the plea agreement.  At the July 7 sentencing hearing, the Government took the position that Defendant's "self-serving," late-provided accounting of cash expenditures was not credible, given his past conduct in failing to disclose this information, given his failure to provide any supporting documentation of this new information, and given his current conduct in the pretrial detention facility.   The Government presented evidence concerning Defendant's activities in the pretrial detention facility, both to illustrate that Defendant is not credible with respect to his late-offered

explanations about his expenditures and assets, and also to demonstrate that Defendant's motion

for release from custody should be denied.[13]

On July 3, 2014, the Government interviewed an informant detained in the same facility

with Defendant.  This informant was charged in an unrelated drug case and was not involved in

Defendant's offense in this case.  This informant came to the attention of the Government when

the informant's attorney advised the Government that Defendant was attempting to use the

inmate PIN calling cards of the informant and other inmates to place calls from the jail.  The

informant advised the Government that Defendant had offered him and other inmates $20 to $30

to use their PIN calling cards.  Defendant was apparently attempting to avoid Government

monitoring of his calls from the jail.  Notably, during his May 6 deposition, the Government had

made Defendant aware that it had been monitoring his recorded calls from the jail.

During the July 3 interview, the informant advised the Government that on May 14,

around 8:00 p.m., Defendant used the PIN calling card of inmate Timothy Stewart to call

Defendant's girlfriend to direct her to sell his weight equipment.  This information resonated

with the Government.  At the July 7 sentencing hearing, IRS Special Agent Lamont Wynn

testified that Defendant had used proceeds of the tax fraud to buy a warehouse in his mother's

name for $48,000 and to buy $100,000 worth of exercise equipment, with the goal of opening a

health club.  Only after the Government had specifically asked Defendant about health

equipment did Defendant reveal that some of the weights were in his mother's basement. The

Government had managed to seize some, but not all, of the exercise equipment that Defendant

had purchased.

---

[13]The Court denied Defendant's motion for release in an oral ruling from the bench at the July 7 hearing. *See* Doc. 40.

Based on the information provided by this informant, the Government obtained several recorded calls that Defendant had placed using Timothy Stewart's PIN calling card, including a conversation on May 19 between Defendant and his girlfriend, Renita.  At the July 7 sentencing hearing, the Government admitted this May 19, 2014 recorded phone call, for purposes of demonstrating that Defendant was talking to Renita about moving money or selling equipment, as further evidence that Defendant had breached the Plea Agreement by not fully and honestly cooperating with the Government in the identification of assets and property constituting proceeds of the tax fraud.

At the start of the May 19 recorded conversation, Defendant immediately declared, "Twelve with one of the long things," followed by asking Renita if she had called an unnamed man.  Then they discussed a man they identified as "14th Street" and Defendant told Renita "that's a no deal."   When Renita told Defendant that "14th Street called me," Defendant responded:

> That's all wrong . . . I'm sure they went and talked to those people because that is where they were.  They went and talked to them.  That's a set up. . . I sure of that because that one of the things in the things that they asked . . . I'm just saying that's awfully funny how that came up I didn't mention any of that stuff that's the exact reason now they know when they go talk to.[14]

Defendant then told Renita, "I already been on the phone too long.  It try to..I call for one reason only one reason to do some things and stuff and I wanted answer and that. It's already gone."  When Renita responded by telling Defendant that she called "the guy that drives the big red truck," Defendant replied,

---

[14]Gov't Ex. 1 at 1.

Yeah, you should've never called there. I would have told you that. . . .  That's information, they know exactly and everything what was going on and stuff, so you know.  I'm sure they have been down there and can find out you know he probably reporting that he still got stuff like that back and stuff.  It's all fucked up, anyway.[15]

Later in the conversation, Defendant told Renita:

I don't know what you going to do on those tickets and that it's bull shit.  I just going to roll over tomorrow.  I'm going to call me to set up the meeting and stuff.  Cause them fuckers aren't giving any money and stuff to have (indecipherable).  It's time to play hard ball now because I'm not taking the fall for stupid people....Parents, sister, and brother they can get in jail, if I put them in jail, I'll put them in jail if I can and stuff I'll try my hardest.[16]

Defendant went on to say, "It's going to cost motherfucking farm ground and five years in jail I can put them all away, there, so that's fine with me."

Based on their interview with the informant, at the July 7 hearing the Government presented other evidence concerning Defendant's activities in the pretrial detention facility.  The informant told the Government that Defendant was tutoring other inmates on how to obtain fraudulent tax refunds, advising them to create a company, get a tax identification number and then file a tax return for the company.  The informant also stated that Defendant was coaching inmates on creating a company in order to obtain loans, which Defendant referred to as "free money."  And according to the informant, Defendant stated that he had instructions on these schemes written down and he would provide the informant with this writing when Defendant was released from jail.[17]  The informant further stated that Defendant talked about a scheme

---

[15]*Id.* at 2.

[16]*Id.*

[17]On June 30, 2014 Defendant had filed a Motion for Release from Custody Pending Sentencing.  *See* Doc. 32.

involving cattle.  Special Agent Wynn testified that during his investigation, he learned that

Defendant was involved in a scheme to defraud a bank by selling cattle out of trust and that

Defendant had repaid the bank $25,000 out of the tax fraud proceeds, in an attempt to avoid

litigation or prosecution.

## II.    Discussion

Based on Defendant's failure to provide full, complete and honest information about his

disposition and/or possession of proceeds or property derived from proceeds of his tax fraud, and

based on Defendant's conduct while detained, including surreptitious, coded conversations with

his girlfriend that indicate Defendant is trying to move or hide money or property, the

Government moved for a determination of whether Defendant has breached the Plea Agreement.

Plea agreements are contracts and are essentially governed by the law of contracts.[18]  The

Tenth Circuit has thus held that the "[r]ules of contract law inform the interpretation and

enforcement of promises in a plea agreement."[19] Yet, plea agreements are accorded greater

judicial scrutiny than a commercial contract, given that a defendant's constitutional rights are at

stake and given that due process requires adequate procedural safeguards and fairness in the

administration of justice.[20]  In fact, due process requires that plea agreements be interpreted

---

[18]*Puckett v. United States*, 556 U.S. 129, 137 (2009).

[19]*United States v. Rockwell Int'l Corp.* 124 F.3d 1194, 1199 (10th Cir.1997).

[20] *See United States v. Woltmann*, 610 F.3d 37, 39–40 (2d Cir 2010) (explaining that application of principles of contract interpretation is subject to due process concerns for fairness and adequate procedural safeguards); *United States v. Lewis*, 633 F.3d 262, 269 (4th Cir. 2011) (stating plea agreements must be analyzed with greater scrutiny than commercial contracts because plea agreements necessarily implicate fair administration of justice); *see also United States v. Novosel*, 481 F.3d 1288, 1291–92 (10th Cir. 2007) (explaining that the application of contract principles to plea agreements may be tempered by public policy constraints, because plea agreements necessarily implicate the integrity of the criminal justice system ).

consistent with a defendant's reasonable expectations[21] and understanding and that any

ambiguity be construed in favor of the defendant.[22]

The Government may not unilaterally declare that the defendant has breached the plea

agreement, but must seek a judicial determination of the issue.[23]   And, in moving for a judicial

determination, as the party claiming the breach, the Government has the burden to prove the

breach by a preponderance of the evidence.[24]

As more fully described below, the Court finds that the Government has proved, by a

preponderance of the evidence, that Defendant breached the plea agreement.

> **A.**     **Failure to Fully and Honestly Provide Information and Assist with Recovery of Forfeitable Assets and Other Property in Which Defendant Has or Had an Interest**

The Plea Agreement requires that Defendant "fully and completely assist the United

States in the identification and recovery of forfeitable assets . . . which have been acquired

directly or indirectly through the unlawful activities of the defendant."  It also requires that

Defendant fully cooperate by providing a financial statement that discloses all assets in which

Defendant has any interest or control over, directly or indirectly, "as well as any transfer of

assets that has taken place in the last 5 years."  And, it requires that Defendant not "transfer, or

dispose of any monies, property or assets under defendant's custody or control," without

---

[21]*United States v. Burke*, 633 F.3d 984, 994 (10th Cir. 2011) (holding that to determine whether Government has breached plea agreement, the court must examine the nature of the promise and evaluate the promise in light of the defendant's reasonable understanding of the promise at the time of the guilty plea).

[22] *Id.* (explaining that in determining whether Government has breached plea agreement, the court must look to express language and construe any ambiguities against the Government as the drafter of the agreement.)

[23]*United States  v. Guzman*, 318 F.3d 1191, 1196 (10th Cir. 2003).

[24]*Sternberg v. Sec'y Dep't of Health & Human Servs.*, 299 F.3d 1201, 1206 (10th Cir. 2002) (citing *Allen v. Hadden,* 57 F.3d 1529, 1534 (10th Cir. 1995)).

approval of the Government.

The Government has presented evidence that Defendant did not disclose all assets and/or transfer of assets in the last five years.  Despite the language in the Plea Agreement calling for such disclosure in a financial statement, and despite the Government's attempts to gain further information by deposing Defendant, not until the May 27 sentencing hearing did Defendant offer, in an excited utterance as he left he courtroom, that he had lost monies in the stock market. And, in the aftermath of the May 27 hearing, Defendant for the first time produced records of stock market transactions that identified and quantified a net loss of $1.9 million in the stock market.  Furthermore, not until after the May 27 hearing, did Defendant attempt to identify and itemize his purported $2 million in cash expenditures.  Yet, despite the nature of many of these cash expenditures, Defendant has still produced no records or documentation of the expenditures.  Defendant claims he spent hundreds of thousands of dollars on vacations, travel and tickets to sporting events and concerts, yet suggests that this was all done in cash, not by credit card or check.  This is not credible.  Even if he managed to buy airplane tickets for himself and others with cash, and even if he paid cash for numerous hotels, surely he could produce some plane or hotel receipts.

Furthermore, it is not credible that Defendant would expend cash and keep no records for travel, entertainment and other so-called business expenses associated with writing, editing and marketing his book *Health A Lifestyle*.  Defendant defrauded the United States of more than $4 million in tax refunds, yet has no records of potentially deductible business expenses for a book he published?

Moreover, Defendant's credibility is virtually nil, given the evidence about his jailhouse

activities, tutoring other inmates in tax and bank fraud even as he awaits sentencing on a tax

fraud conviction.  Defendant challenges the credibility of the informant who told the

Government about these activities.  Yet the informant's information is credible, because it is

corroborated by other credible evidence.  The informant was not involved in Defendant's tax

fraud offense, nor his cattle scheme to defraud the bank.  Thus, when the informant spoke of

creating a company,[25] getting a tax identification number, and filing tax returns to get tax

refunds, and also spoke of getting "free money" by getting loans in the company name, the

source of these statements had to be Defendant, the one who actually engaged in these activities.

Furthermore, the informant's credibility was demonstrated when the Government found

that in fact Defendant had used Timothy Stewart's PIN calling card to call Renita, just as the

informant advised.  And, although Defendant and Renita's conversation on May 19 was heavily

coded, a plausible interpretation of that conversation was that Defendant was directing Renita to

sell the weight equipment not yet found and recovered by the IRS, just as Defendant told the

informant.  For the May 19 conversation was replete with code words—"twelve with one of the

long things,"— and other language indicative of a transaction— "I call for one reason only one

reason to do some things and stuff and I wanted answer and that. It's already gone."  And, this

conversation also included language indicative that Defendant was concerned about Government

detection, for when Renita told Defendant that she didn't initiate a contact, but rather "14th Street

called me," Defendant expresses displeasure or distrust, saying  "I'm sure they went and talked

to those people because that is where they were. They went and talked to them.  That's a set up."

And, the conversation also suggests that Defendant has information about the criminal

---

[25]Defendant did not create company; he accomplished this offense by using the EIN of his parents' existing
farming operation.

activities of his family members, "It's time to play hard ball now because I'm not taking the fall

for stupid people....Parents, sister, and brother they can get in jail, if I put them in jail, I'll put

them in jail if I can and stuff I'll try my hardest."  Yet, despite his obligation in the Plea

Agreement to fully cooperate with the Government including disclosing assets held by third

parties, Defendant has told the Government nothing about any involvement of family members

in his offense or related conduct.

Defendant argues that at the May 27 hearing the Government did not take the position

that he had breached the Plea Agreement.  That is true.  At the May 27 sentencing hearing, the

Government stated that Defendant was forthcoming with information, but only to the extent that

Defendant responded to specific questions posed by the Government that were based on the

Government's awareness of certain property or transactions.  Yet the Government did not take

the position that Defendant had breached the Plea Agreement.

But after the Court continued the hearing on May 27, there were a number of

developments that justified the Government's change of position: (1) Defendant, for the first

time revealed that he had lost $3 million in the stock market; (2) the Government learned from

an informant that Defendant was attempting to use other inmates' PIN calling cards to call

Renita and direct her to sell weight equipment; and (3) the Government learned from the same

informant that Defendant was coaching other inmates on how to commit tax fraud.  These

developments all implicated Defendant's obligation under the Plea Agreement to fully and

completely disclose assets and transfers.  These developments also implicated the Government's

reservation in the Plea Agreement, of its right to request a hearing to determine whether

Defendant had breached his plea agreement, when Defendant "denies or gives conflicting

14

statements as to his involvement . . . willfully obstructs or impedes the administration of justice as defined in U.S.S.G. §3C1.1 (or willfully attempts to do so), or engages in additional criminal conduct."

The Court concludes that the Government has demonstrated by a preponderance of the evidence that Defendant has breached the Plea Agreement by failing to fully disclose and cooperate in the identification and recovery of assets, and failing to fully disclose transfers and dispositions of assets and monies acquired through the tax fraud.  Moreover, although it is not clear whether Defendant has sold weight equipment without the Government's knowledge or approval, the evidence suggests Defendant was contemplating or attempting to have Renita sell weight equipment without the Government's knowledge or permission.  The Court further finds, by a preponderance of evidence, that Defendant's breach was material, because his failure to disclose and cooperate in the identification and recovery of assets, and failure to fully disclose transfers and dispositions of proceeds, implicates the ability of the Government to recover property and victims to recoup restitution, pursuant to the order of restitution agreed to in the Plea Agreement.

**B.      Defendant's Breach of Plea Agreement Releases Government from its Obligations Under Plea Agreement**

The Government does not seeks to void the Plea Agreement, but seeks release from its obligations under the Plea Agreement.  The Government has not specified which obligations from which it seeks release.  But the Plea Agreement addresses the effect and remedy for Defendant's breach in paragraph 5,[26] which *inter alia* obligates the Government to: recommend a

---

[26]In contrast, when the Government has breached a plea agreement, the Supreme Court has held there are two possible remedies: specific performance of the plea agreement, meaning a sentencing hearing at which the Government says what it promised to say, or alternatively, giving the defendant an opportunity to withdraw his plea.

36-month sentence; not file any additional charges against Defendant or anyone acting in concert

with Defendant, arising out of the facts forming the basis for the Indictment; and advocate for

Defendant to receive a two-level, or under certain circumstances, a three-level reduction for

acceptance of responsibility.  The Plea Agreement expressly releases the Government from these

three obligations in the event Defendant has breached the agreement, stating:

> [i]n the event the Court finds the defendant has breached this plea agreement or
> otherwise failed to adhere to its terms, the United States shall not be bound by this
> paragraph and may pursue any additional charges arising from the criminal
> activity under investigation as well as any perjury, false statement, or obstruction
> of justice charges which may have occurred.[27]

Based on the express language in the parties' Plea Agreement, the Government is released from

its obligations under Paragraph 5 of the Plea Agreement.

**IT THEREFORE ORDERED** that the Motion to Determine if Defendant Has Breached

His Plea Agreement (Doc. 37) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk shall issue a notice for the date and time of

the continued sentencing hearing.

**IT IS SO ORDERED.**

Dated: August 27, 2014

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

*Santobello v. New York,* 404 U.S. 257, 263, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *see also United States v. Oakes*, 680 F.3d 1243, 1247 (10th Cir. 2012) (explaining that the discretion lies with the Court to choose which remedy to apply when the Government breaches).

[27]Doc. 27 ¶ 5.